**UNITED STATES of America,**

v.

**Robert BROWN, Defendant.**

**No. 67 Cr. 584.**

United States District Court
S. D. New York.

Oct. 18, 1967.

**562**

Robert M. Morgenthau, U. S. Atty., for the Southern District of New York, by Terry F. Lenzner, Asst. U. S. Atty., for the United States.

Lipsitz, Green, Fahringer, Roll, Schuler & James, by Herald Price Fahringer, Buffalo, N. Y., for defendant.

## OPINION

TYLER, District Judge.

This is a motion by defendant Robert Brown for an order under Rule 41(e) of the Federal Rules of Criminal Procedure directing suppression and return of 419 cartons of magazines and other materials alleged to be obscene. For reasons to be discussed hereinafter, defendant's motion is granted.

Brown is the sole owner of the Overstock Book Co., Inc. in midtown New York, where the seizure took place on June 23, 1967. The seizure was made pursuant to a search warrant issued by Commissioner Earle Bishopp on that day, ordering a search of the second and third floors of the building in which the company is located and the seizure of "16 cartons containing obscene books * * *" which were alleged to be the fruits of the crime of transporting obscene material in interstate commerce. 18 U.S.C. § 1462 (1964). The applicable warrant was supported by the sworn affidavit of a special agent of the FBI which set forth that:

1) a theretofore reliable informant had notified the FBI that a number of cartons of obscene books were located at JFK International Airport;

2) another FBI agent had observed the contents of 3 of the 16 cartons mentioned in the warrant and the affiant was advised by the FBI that the other agent had found the contents to be obscene books, pamphlets and pictures;

3) the airbill covering the carriage of the cartons showed that they had been transported in interstate commerce; and

4) observation and investigation had led the affiant to conclude that the cartons could be found at the indicated premises.

None of the contents of the cartons were submitted to the Commissioner for his perusal; thus, there was no judicial determination, preliminary or otherwise, of obscenity prior to issuance and execution of the operative warrant.

Armed with the search warrant, agents of the FBI proceeded to seize a total of 419 cartons of allegedly obscene material on the premises of the Overstock Book Co. and arrest the defendant. He was subsequently indicted on June 29, 1967 and charged with transporting 16 cartons of obscene material in interstate commerce in violation of Sections 1465 and 1462 of Title 18 of the United States Code. Defendant has pleaded not guilty to this indictment.

 At the threshold, defendant is faced with the government's contention that he has no standing to suppress under Rule 41(e). Relief under this rule is available only to a "person aggrieved" by the search. To be such a person, one is required to have a recognizable interest in the property seized or the premises searched. This requirement could be met if the movant was "legitimately on the premises where [the] search" occurred. Jones v. United States, 362 U.S. 257, 267, 80 S.Ct. 725, 734, 4 L.Ed.2d 697 (1960), but the affidavits of the parties conflict on this point. This factual dispute need not be resolved, however, since the defendant properly comes within the ambit of the protection afforded to those with a recognizable interest in property seized.

 In United States ex rel. DeForte v. Mancusi, 379 F.2d 897 (2d Cir. 1967), the Second Circuit ruled that a union vice-president had standing to object to

the seizure of union books, holding he was the "victim" of the search, the "one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search and seizure directed at someone else." Id. at 903. The court explained that

> "the allegedly improper activities which the state was attempting to curtail could be halted only by prosecuting DeForte and his fellow union officials. Little would have been gained by prosecuting or fining the union alone, or even driving it to extinction, for the guiding culprits would have remained free to conduct their illegal activities through a different proscenium." Id. at 902.

Though the Second Circuit went on to caution that its standing rule did not apply to "every stockholder, or employee" Id. at 905, it seems plain that it does apply to the sole owner of a corporation. It was Brown, the corporate owner, against whom the search here was directed; therefore, he has standing to contest the legality of the search.

The government's main contention on the merits is that the seizure was made pursuant to a valid search warrant. Alternatively, they contend that it was made incident to a lawful arrest. Were this a typical case of a seizure of contraband, I would assume arguendo that it could be sustained on either ground. See United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); United States v. Beigel, 254 F.Supp. 923 (S.D.N.Y.1966), aff'd, 370 F.2d 751 (2d Cir. 1967). But alleged obscenity cannot be treated as mere contraband. Marcus v. Search Warrant, 367 U.S. 717, 730–31, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961); A Quantity of Copies of Books v. Kansas, 378 U.S. 205, 211–12, 84 S. Ct. 1723, 12 L.Ed.2d 809 (1964). "(T)he line between speech unconditionally guaranteed and speech which may legitimately be regulated, suppressed, or punished is finely drawn * * *. The separation of legitimate from illegitimate speech calls for * * * sensitive tools * * *." Speiser v. Randall, 357 U.S. 513, 525, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958).

■ Although the Supreme Court has not set down the precise constitutional standards for a conventional search and seizure of obscene materials in a criminal case, it has had occasion to express its view on such searches and seizures in the context of three civil forfeiture cases. A Quantity of Copies of Books, supra; Marcus, supra; Kingsley Books, Inc. v. Brown, 354 U.S. 436, 77 S.Ct. 1325, 1 L.Ed.2d 1469 (1957). The standards laid down in those cases would seem to be applicable to this motion. A search and seizure for the purpose of gathering evidence for a criminal obscenity prosecution imparts at least the same potential restraint on the dissemination of material protected by the First Amendment as one made solely for the purpose of commencing forfeiture proceedings. See Evergreen Review, Inc. v. Cahn, 230 F.Supp. 498, 504 (E.D.N.Y.1964); Flack v. Municipal Court, 59 Cal.Rptr. 872, 429 P.2d 192 (Cal.1967).

■ The common thread running through recent Supreme Court decisions on the seizure of allegedly obscene matter is that because the line between protected and unprotected speech is so difficult to draw, dissemination of a particular work should be completely undisturbed, at least until an independent determination of obscenity is made by a judicial officer. Complete restraint on any work must await a final judicial determination of obscenity.

These guidelines first appeared in Kingsley Books, Inc. v. Brown, supra. In Kingsley, the Supreme Court upheld New York's civil anti-obscenity procedure against an attack based on First Amendment principles. In essence, the New York procedure began with a preliminary hearing on notice, at which time the judge was to view the allegedly obscene material and decide whether to issue an injunction pendente lite. If one was issued, the restraint ran only against the publications found obscene at

the preliminary hearing. The Supreme Court noted that until the full adversary proceedings were completed, however, the bookseller could retain the books and even sell them, subject, of course, to the possible sanction of contempt, especially if the final determination was that the material was obscene. Judging from the subsequent decisions in the area, it appears that the procedures described in *Kingsley* approach the minimum safeguards allowable under the federal constitution.

*Kingsley* was followed by Marcus v. Search Warrant, supra, a case with a fact pattern substantially similar to the one at bar. There a Missouri police officer purchased some magazines at local newsstands and, after a perusal of their contents, swore out a civil complaint stating that to his knowledge the magazines were obscene. No copies of the magazines were filed with the complaint or shown to the judicial officer issuing the search warrants. Six warrants were issued ordering the seizure of "obscene materials" at the newsstands. The officials executing the warrants did not confine their seizure to the magazines inspected by the officer who swore out the complaint. Instead, they seized all magazines which in their judgment were obscene—a total of approximately 11,000 copies of 280 publications. In holding the Missouri procedures defective, the Supreme Court said:

"Putting to one side the fact that no opportunity was afforded the appellants to elicit and contest the reasons for the officer's belief, or otherwise to argue against the propriety of the seizure to the issuing judge, still the warrants issued on the strength of the conclusory assertions of a single police officer, without any scrutiny by the judge of any materials considered by the complainant to be obscene. The warrants gave the broadest discretion to the executing officers; they merely repeated the language of the statute and the complaints, specified no publications, and left to the individual judgment of each of the many police officers involved the selection of such magazines as in his view constituted 'obscene * * * publications.'" Marcus v. Search Warrant, supra, 367 U.S. at 731–32, 81 S.Ct. at 1716.

The Missouri procedure was characterized as "the most effective restraint possible" in contradistinction to the "limited injunctive remedy" permitted in *Kingsley*.

The question of the necessity of a preliminary adversary hearing, put to one side in *Marcus,* was central to the Court's decision in A Quantity of Copies of Books v. Kansas, supra. In that case, the judge issuing the warrant did view 6 of the volumes seized and, after holding a 45 minute *ex parte* inquiry, personally found them obscene. Concluding that all books in the series were obscene, he directed the seizure of some 59 titles. Kansas officers then confiscated 1,715 copies of the 31 novels they could find. Again finding the procedures constitutionally insufficient, the Supreme Court ordered a judgment of forfeiture reversed. Regarding the extent of the seizure and the absence of a preliminary adversary proceeding, the Court observed:

"It is our view that since the warrant here authorized the sheriff to seize all copies of the specified titles, and since P–K was not afforded a hearing on the question of the obscenity even of the seven novels before the warrant issued, the procedure was likewise constitutionally deficient." A Quantity of Copies of Books v. Kansas, supra at 210, 84 S.Ct. at 1725.

"For if seizure of books precedes an adversary determination of their obscenity, there is danger of abridgment of the right of the public in a free society to unobstructed circulation of nonobscene books." A Quantity of Copies of Books v. Kansas, supra at 213, 84 S.Ct. at 1727.

Subsequent Supreme Court decisions have not eased the procedural burden on governmental officials conducting searches and seizures for obscene materials. Cf. Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649

(1965); Stanford v. Texas, 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965). The Court's refusal to decide the seizure issue in Mishkin v. New York, 383 U.S. 502, 86 S.Ct. 958, 16 L.Ed.2d 56 (1966), was based on the complete absence of pertinent data in the record on appeal and the defendant's failure to press the issue in any of the lower courts.

■ In the case at bar, a massive seizure of allegedly obscene material has taken place, notwithstanding the fact that the contents of only 3 of the 419 cartons seized were examined before the warrant was issued. The commissioner ordering the seizure saw not one of the myriad publications prior to issuing the warrant and the defendant was not given an opportunity to contest the conclusions of the government. Though the warrant permitting the seizure failed to list the name of a single publication and ordered the seizure of only 16 cartons, 403 more were taken by federal officials. Under the teaching of *Marcus* and *A Quantity of Copies of Books*, the seizure pursuant to the warrant was not constitutionally permissible; thus the evidence gathered by the government must be suppressed and returned to the defendant.

■ This result cannot be avoided by the rubric of a search incident to a lawful arrest. As heretofore discussed, the Supreme Court has apparently determined that borderline speech must be protected by the application of relatively elaborate procedures prior to suppression via seizure. Such procedures are impossible to follow in a seizure incident to arrest. As the Supreme Court of California recently noted,

"within the precinct of the First Amendment, only the requirement that a search warrant be obtained prior to any search or seizure assures a free society that the sensitive determination of obscenity will be made judicially and not *ad hoc* by police officers in the field." Flack v. Municipal Court, 59 Cal.Rptr. at 879, 429 P.2d at 199.

To the extent that United States v. Klaw, 227 F.Supp. 12 (S.D.N.Y.1964), reversed on other grounds, 350 F.2d 155 (2d Cir. 1965) reaches a contrary conclusion, I choose not to follow it.

Although the government does not urge their application here, something should be said about the recent spate of cases involving the constitutionality of Section 305 of the Tariff Act of 1930, 46 Stat. 688, as amended, 19 U.S.C. § 1305 (1964), which permits customs officials to hold and inspect allegedly obscene imports to determine whether forfeiture proceedings should be instituted. Many of these cases rely heavily on Freedman v. Maryland, supra, a Supreme Court opinion finding Maryland's film censorship statute unconstitutional and setting up narrow constitutional guidelines for the rapid adjudication of obscenity. The prevailing view is that the statute is constitutional so long as procedures analogous to those described in *Freedman* are followed. See e. g., United States v. 56 Cartons of the Magazine Entitled "Hellenic Sun", 373 F. 2d 635 (4th Cir. 1967); United States v. One Carton Positive Motion Picture Film Entitled "491", 367 F.2d 889 (2d Cir. 1966); United States v. One Book Entitled "The Adventures of Father Silas", 249 F.Supp. 911 (S.D.N.Y.1966). Contra, United States v. 18 Packages of Magazines, 238 F.Supp. 846 (N.D.Cal. 1964). The customs cases permitting censorship of films are explicable on the same basis as the *Freedman* decision— i. e., the theory that films have a capacity to be far more offensive than books and magazines. See United States v. One Carton Positive Motion Picture Film Entitled "491", supra at 907 (dissenting opinion of Chief Judge Lumbard). The rationale permitting the detention of other material protected by the First Amendment has never been satisfactorily spelled out. It is significant that unlike books and magazines which are printed in the United States, material printed abroad must, of necessity, pass through the hands of customs officials where it is examined for various purposes, just as all other imports are

inspected. Once this period of detention for general customs purposes has ceased, however, it would seem that under *Kingsley, Marcus* and *A Quantity of Copies of Books,* the customs officials should be required to turn over the publications to the claimant, subject to later injunctive proceedings, rather than holding onto them, as they do now, until after a judicial determination on the question of obscenity.

In any event, these cases are distinguishable because they are in the customs area, where statute and practice have combined to create rather rigid procedural safeguards and the rapid judicial determination of obscenity. These safeguards were wholly absent in the seizure of defendant's publications. Defendant's motion to suppress and return is granted. It is so ordered.