UNITED STATES ex rel. Edward
MISHKIN, Petitioner,

v.

James A. THOMAS, Warden of the City
Penitentiary of the City of New
York, Respondent.

68 Civ. 464.

United States District Court
S. D. New York.

April 2, 1968.

Leon H. A. Pierson, Joseph Rosenthal, Baltimore, Md., Murray Pudalov, Massapequa Park, N. Y., for petitioner.

Frank S. Hogan, Dist. Atty., of New York County, New York City, for respondent; H. Richard Uviller, Alan F. Scribner, Asst. Dist. Attys., of counsel.

## OPINION

FRANKEL, District Judge.

This habeas corpus proceeding poses as its first question a puzzling study in chronology and constitutional law. The subject is an allegedly unlawful series of searches and seizures in 1959 and 1960; the use of evidence thus obtained to produce a judgment of conviction on December 14, 1960; the petitioner's claim for relief in this collateral attack under the rule announced on June 19, 1961, in Mapp v. State of Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081; and the effect upon this claim of the doctrine of limited prospectivity laid down in Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), as this doctrine may in turn have been affected by Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), and Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). The nature of the riddle requires more than customary attention to the dates in the litigation itself as potentially critical operative facts.

For reasons canvassed under headings I–III of the following discussion, the court reaches the merits. On grounds thereafter stated (see "IV," infra), the writ is granted.

### I.

Late in 1959 and early in 1960, New York City police conducted some four or five searches and seizures—one ostensibly with a warrant, the others allegedly incidental to lawful arrests—by which they gathered a substantial quantity of books and cartoons claimed to be obscene. On March 8, 1960, the New York County District Attorney filed an information in numerous counts, based upon the seized materials, charging petitioner with violating Section 1141 of the New York Penal Law, McKinney's Consol.Laws, c. 40 (obscenity) and Section 330 of the General Business Law, McKinney's Consol.Laws, c. 20 (failure to imprint publisher's or printer's name). Following a trial in the City Court of Special Sessions, petitioner was found guilty on some 172 counts—about 140 under the obscenity statute, the remaining 32 or so under the General Business Law.[1] On December 14, 1960, he was sentenced to a total of three years in prison and fines aggregating $12,000 on the obscenity counts, and to fines of $500 on the General Business Law counts. The obscenity convictions

---

1. There is some slight confusion in the papers as to the exact number of counts. The approximate numbers being what they are, the matter is of no importance.

were affirmed by the Appellate Division, First Department, 17 A.D.2d 243, 234 N.Y.S.2d 342, on November 27, 1962, and by the Court of Appeals, 15 N.Y.2d 671, 255 N.Y.S.2d 881, 204 N.E.2d 209, on December 3, 1964.[2]

In the trial court—having failed, like others, to foresee the decision in Mapp v. State of Ohio, supra,—petitioner took only incipient and insufficient steps to ground a full assault upon what was then the still authoritative rule of Wolf v. State of Colorado, 338 U.S. 25, 69 S. Ct. 1359, 93 L.Ed. 1782 (1949). Although his counsel raised a question as to the adequacy of the search warrant and supporting affidavit involved in one of the seizures, the matter was left as only a partially developed issue. Explaining this, petitioner's Memorandum here says (p. 2):

"In view of the then posture of the law in the State of New York concerning the matter of search and seizure as enunciated in People v. Defore, 242 N.Y. 13 [150 N.E. 585] (1926), the question of the adequacy of the search warrant was not pursued to an ultimate finding at the trial level nor was the Warrant or the Affidavit made part of the record."

Similarly, to support his contention that the subject of the seizures was in general left incompletely explored by the state courts, petitioner points out (id. at 2–3) that "no findings of facts or conclusions of law were made by the Trial Court as to the basis on which it admitted into evidence the 17,000 books in question."

Thus, the trial record appeared to be in less than ideal shape for Mapp purposes when the Mapp decision came down in June of 1961—while petitioner's direct appeal was pending in the Appellate Division, and well over a year before that Court's affirmance of the convictions here in question. Nevertheless, it is undisputed that petitioner acted promptly to preserve his Fourth Amendment contentions. Although the topic was not mentioned by the Appellate Division in its brief per curiam decision, and the affirmance by the Court of Appeals was without opinion, the latter tribunal later amended its remittitur to make clear that the point had been raised and decided. 15 N.Y.2d 724, 256 N.Y.S.2d 936, 205 N.E.2d 201 (Jan. 7, 1965).

In the Supreme Court, petitioner again briefed and argued his claims under Mapp. The Court concluded, however (after rejecting his claims on the obscenity question), that the record was insufficient to present his complaints about the seizures. Mishkin v. State of New York, 383 U.S. 502, 512–513, 86 S.Ct. 958, 965–966, 16 L.Ed.2d 56 (1966):

"The far-reaching and important questions tendered by this claim are not presented by the record with sufficient clarity to require or justify their decision. Appellant's standing to assert the claim in regard to all the seizures is not entirely clear; there is no finding on the extent or nature of his interest in two book stores, the Main Stem Book Shop and Midget Book Shop, in which some of the books were seized. The State seeks to justify the basement storeroom seizure, in part, on the basis of the consent of the printer-accomplice; but there were no findings as to the authority of the printer over the access to the storeroom, or as to the voluntariness of his alleged consent. It is also maintained that the seizure in the storeroom was made on the authority of a search warrant; yet neither the affidavit upon which the warrant issued nor the warrant itself is in the record. Finally, while the search and seizure issue has a First Amendment aspect because of the alleged massive quality

---

**2.** The Appellate Division (the decision of which was in all respects, and without opinion, affirmed by the Court of Appeals) reversed the convictions under the General Business Law, holding the statute unconstitutional, a detail which is of no special interest now.

of the seizures, see A Quantity of Copies of Books v. State of Kansas, 378 U.S. 205, 206, 84 S.Ct. 1723, 12 L.Ed.2d 809 (opinion of Brennan, J.); Marcus v. Search Warrant, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127, the record in this regard is inadequate. There is neither evidence nor findings as to how many of the total available copies of the books in the various bookstores were seized and it is impossible to determine whether the books seized in the basement storeroom were on the threshold of dissemination. Indeed, this First Amendment aspect apparently was not presented or considered by the state courts, nor was it raised in appellant's jurisdictional statement; it appeared for the first time in his brief on the merits.

"In light of these circumstances, which were not fully apprehended at the time we took the case, we decline to reach the merits of the search and seizure claim; insofar as notation of probable jurisdiction may be regarded as a grant of the certiorari writ on the search and seizure issue, that writ is dismissed as improvidently granted."

Having exhausted his avenues of direct review, petitioner then brought a state *coram nobis* proceeding on his *Mapp* charges. The petition was denied at *nisi prius* without a hearing. The Appellate Division affirmed. The Court of Appeals likewise affirmed, in a four-sentence *per curiam*, which says (People v. Mishkin, 20 N.Y.2d 716, 282 N.Y.S.2d 779, 780, 229 N.E.2d 454, 455):

"Order affirmed in a memorandum. The decision in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, was announced while this criminal action was pending on appeal, the judgment of conviction was affirmed by this court (15 N.Y.2d 671, 255 N.Y. S.2d 881, 204 N.E.2d 209) and likewise by the Supreme Court of the United States (383 U.S. 502, 86 S. Ct. 958, 16 L.Ed.2d 56). The Supreme Court stated that the constitu-

tional questions under Mapp v. Ohio were 'not presented by the record with sufficient clarity' (supra, pp. 512–513, 86 S.Ct. p. 965). Moreover, it is not now sought to be raised on appeal from the judgment of conviction but on the postconviction writ of error. *coram nobis* where it is not available (People v. Muller, 11 N.Y.2d 154, 227 N.Y.S.2d 421, 182 N.E.2d 99; Linkletter v. Walker, 381 U.S. 618, 85 S. Ct. 1731, 14 L.Ed.2d 601)."

Chief Judge Fuld (joined by Judges Burke and Bergan) wrote a dissent. He noted that other cases, tried before *Mapp* but still on direct review when that decision came down, had been tested on review by the rule of *Mapp*, or, if their records were inadequate for that, remanded for hearings and for reversal of the convictions if they could not then be sustained under *Mapp*. He concluded that denial of the same opportunity to this petitioner could not be justified (20 N.Y.2d at 718, 282 N.Y.S.2d at 781, 229 N.E.2d at 456):

"Since we inadvertently neglected to do this with respect to the defendant before us, we should now afford him an opportunity to demonstrate that the evidence against him was illegally obtained. (Cf. United States ex rel. De Forte v. Mancusi, 2 Cir., 379 F.2d 897, 900 n. 4 [decided 6/28/67].) Indeed, to refuse to give him a hearing on that issue when one has been accorded to all other defendants similarly situated amounts to a denial of equal protection of the laws."

With his state remedies thus exhausted, petitioner brought this federal habeas proceeding.

II.

In Linkletter v. Walker, supra, the Supreme Court considered, and answered in the negative, the question whether the rule in *Mapp* would apply retroactively to convictions which had become final before June 19, 1961—with "final" being defined for this purpose to cover cases "where the judgment of conviction was rendered, the availability of appeal

exhausted, and the time for petition for certiorari had elapsed before [the] * * decision in Mapp v. State of Ohio." 381 U.S. at 622 n. 5, 85 S.Ct. at 1734 n. 5. From that negative determination, sufficient to decide *Linkletter* on its actual facts, petitioner would derive the affirmative proposition that the *Mapp* principle *does* govern cases which had *not* become "final" until after June 19, 1961, and is therefore applicable here. Respondent points out that, at least as a logical matter, this is not necessarily so. Proceeding beyond logic, respondent mounts weighty arguments from later variants of the "prospectivity" doctrine to show that there is no principled reason why *Mapp* should be held applicable to cases *tried* before that decision.

For example, respondent observes, when the problem of cases tried but not necessarily "final" came to be considered in Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), the Supreme Court concluded that the retroactive reach of Escobedo v. State of Illinois, 378 U.S. 478, 84 S. Ct. 1758, 12 L.Ed.2d 977 (1964), and Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), should not extend farther than to cases "in which the trial began" after the dates of these two decisions. 384 U.S. at 721, 86 S.Ct. 1772. Then, it is noted, in Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), the retrospective effect of United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and Gilbert v. State of California, 388 U.S. 263, 87 S. Ct. 1951, 18 L.Ed.2d 1178 (1967), was limited to cases in which the *operative facts* now held to offend due process occurred after the date of the decisions so holding.

There is no persuasive ground, respondent argues, for holding the *Mapp* rule any less prospective than the rules of *Escobedo* and *Miranda*, affecting con-

fessions, or the rule of *Wade* and *Gilbert*, "requiring the exclusion of identification evidence which is tainted by exhibiting the accused to identifying witnesses before trial in the absence of his counsel * * *." Stovall v. Denno, supra, 388 U.S. at 294, 87 S.Ct. at 1968. All three, this contention proceeds, are essentially prophylactic rules to govern police and prosecutorial conduct in the future, not standards affecting the "truth-determining process" (*Stovall*, at 298, 87 S.Ct. 1967). Cf. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); Griffin v. State of Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956). Respondent recognizes that *Mapp* has been applied by the Supreme Court itself with a measure of retroactivity which would govern the instant case (Linkletter v. Walker, supra, 381 U.S. at 622 n. 4, 85 S.Ct. 1731, citing the cases), and that the Court of Appeals for this Circuit has gone on the same premise, United States ex rel. Carafas v. LaVallee, 334 F.2d 331 (1964), cert. denied, 381 U.S. 951, 85 S.Ct. 1798, 14 L.Ed.2d 725 (1965); United States ex rel. West v. LaVallee, 335 F.2d 230 (2 Cir., 1964), cert. denied, 381 U.S. 951, 85 S.Ct. 1798, 14 L.Ed. 725 (1965); United States ex rel. Wilson v. Murphy, 335 F.2d 550 (1964). Practically all such cases were decided, however, before *Johnson* (June 20, 1966) and *Stovall* (June 12, 1967), and the few later pronouncements to the same effect (e. g., United States ex rel. De-Forte v. Mancusi, 379 F.2d 897, 900 n. 4 (2 Cir., 1967)), like the earlier ones, were made "without discussion" (*Johnson*, 384 U.S. at 732, 86 S.Ct. 1772) of the asserted claim for consistency now tendered by respondent.

As has been said, respondent's analysis, truncated here for reasons soon to appear, is a weighty one. But the question whether it ought to be accepted may be postponed for another day.[3] As-

---

3. Because of the postponement, it is a sufficient reservation merely to note that there are substantial arguments with which respondent would have to reckon

if his *Linkletter-Johnson-Stovall* synthesis were thought to be critical. Apart from the string of precedents opposed (at least in result), there is the question,

suming *arguendo*, as the saying runs, that the thesis would be a proper one in a case involving only the chronological factors thus far considered, there are other elements here of overriding significance which require that this petitioner should be heard on his claim that his imprisonment flows from unconstitutional searches and seizures. It is time to turn (or return, since the paramount point was made in the dissent of Chief Judge Fuld quoted above) to these decisive matters.

### III.

The state courts have been "entirely free," before as well as after *Linkletter*, "to effectuate under their own law stricter standards than those * * * laid down" by the Supreme Court, "and to apply those standards in a broader range of cases than is required" by that Court's rulings on prospectivity. Johnson v. State of New Jersey, supra, 384 U.S. at 733, 86 S.Ct. at 1781; cf. Paul-

sen, State Constitutions, State Courts, and First Amendment Freedoms, 4 Vand.L.Rev. 620, 642 (1951).

As has been mentioned above, New York's Court of Appeals exercised this power. Promptly after *Mapp* and almost four years before *Linkletter*, that Court decreed that (1) cases still in the appellate works on direct review which raised issues under *Mapp*, though their trials had ended before *Mapp*, would be ruled by that decision, and (2) such cases would be remanded for a hearing of *Mapp* claims where the records revealed a search and seizure problem but were insufficient for its resolution without further exploration. People v. Loria, 10 N.Y.2d 368, 223 N.Y.S.2d 462, 179 N.E.2d 478 (Nov. 30, 1961). That remained the law in New York until at least October 27, 1966, when *Loria* was overruled in some uncertain degree by People v. McQueen, 18 N.Y.2d 337, 274 N.Y.S.2d 886, 221 N.E.2d 550 (1966).[4]

pretermitted here, whether the relevant judgments of policy are the same for the *Mapp* rule as for the other prophylaxes said to be analogous. Cf. *Johnson*, supra, 384 U.S. at 731, 86 S.Ct. 1772, 1780, stating that reliance by law enforcers on the state of the law before the changes wrought by *Escobedo* and *Miranda* afforded them a "favorable comparison to the situation before *Mapp* * * *, where the States at least knew that they were constitutionally forbidden from engaging in unreasonable searches and seizures under Wolf v. People of State of Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949)."

4. Even under *McQueen*, there is substantial (though uncertain) ground for believing that New York would continue to apply *Mapp* to cases not yet "final" in the *Linkletter* sense, while following the rules of shortened retrospectivity under *Johnson* and *Stovall*. The majority in *McQueen* said (18 N.Y.2d at 344, 274 N.Y.S.2d at 890, 221 N.E.2d at 553):

"[I]n applying the changes in the law effectuated by Miranda * * * there is no reason on account of which we should go beyond what the Supreme Court has required in applying these rules to prior convictions. Anything held to the contrary in People v. Loria * * * should be regarded as overruled."

In his concurring opinion, Judge Scileppi said (18 N.Y.2d at 347, 274 N.Y.S.2d at 893, 221 N.E.2d at 555):

"In People v. Loria * * * we * * * [held] that the rule announced in Mapp v. Ohio * * * was to be applied to cases still in the appellate process. As subsequent events proved, we eventually would have been compelled to apply *Mapp* to pending appeals, if we had not done so voluntarily (see Linkletter v. Walker, 381 U.S. 618, 627, 85 S.Ct. 1731, 14 L.Ed.2d 601 * * *)."

See also People v. Morhouse, 21 N.Y.2d 66, 85, 286 N.Y.S.2d 657, 672–73, 233 N.E.2d 705 (1967) (Christ, J., dissenting) ; People v. Kaiser, 21 N.Y.2d 86, 107, 286 N.Y.S.2d 801, 818–19, 233 N.E.2d 818 (1967) (Fuld, C. J., dissenting).

Of course, the exact meaning of those expressions has become largely academic for *Mapp* purposes since the cases to which they might apply are likely to have become "final" in the seven years since *Mapp* was decided. As appears more fully in the text of this opinion, the important point is the undisputed, and evidently indisputable, one that *Loria* represented the effective law as it was being applied by New York's appellate courts both before and after they heard Mishkin's appeals.

This proposition requires no notion of the law as a "brooding omnipresence" or even a "prophecy;" it rests upon the ineluctable data of decided cases following and applying *Loria* without question right up to and past the time when this petitioner's appeals were rejected. See People v. Coffey, 11 N.Y.2d 142, 227 N.Y.S.2d 412, 182 N.E.2d 92 (1962); People v. O'Neill, 11 N.Y.2d 148, 227 N.Y.S.2d 416, 182 N.E.2d 95 (1962); People v. Muller, 11 N.Y.2d 154, 227 N.Y.S.2d 421, 182 N.E.2d 99 (1962); People v. Friola, 11 N.Y.2d 157, 227 N.Y.S.2d 423, 182 N.E.2d 100 (1962); People v. Yarmosh, 11 N.Y.2d 397, 230 N.Y.S.2d 185, 184 N.E.2d 165 (1962); People v. Wade, 12 N.Y.2d 61, 236 N.Y.S.2d 36, 187 N.E.2d 111 (1962); People v. Kelly, 12 N.Y.2d 248, 238 N.Y.S.2d 934, 189 N.E.2d 477 (1963); People v. Wilson, 16 A.D.2d 207, 229 N.Y.S.2d 685 (1st Dep't 1962); People v. Nettingham, 17 A.D.2d 979, 234 N.Y.S.2d 187 (2d Dep't 1962), cert. denied, 375 U.S. 841, 84 S. Ct. 88, 11 L.Ed.2d 68 (1963). Although it is not explicitly stated, People v. Amendolare, 12 N.Y.2d 867, 237 N.Y.S. 2d 341, 187 N.E.2d 793 (1962), and People v. Stokes, 15 N.Y.2d 534, 254 N.Y.S.2d 123, 202 N.E.2d 567 (Oct. 15, 1964—less than two months before the affirmance of Mishkin's conviction), appear to have involved pre-*Mapp* trials.[5] And the Appellate Division, First Department, held *Loria* applicable to a case decided almost a year after it had affirmed Mishkin's conviction. People v. Ostolaza, 19 A.D.2d 871, 244 N.Y.S.2d 96 (1st Dep't Nov. 19, 1963). See also People v. Surita, 18 A.D.2d 1064, 239 N.Y.S.2d 405 (1st Dep't 1963).[6]

5. *Although* Loria *was applied by both the Court of Appeals and the Appellate Division in cases decided after November 27, 1962 (the day the First Department affirmed Mishkin's conviction), this court has found no case in which the New York courts remanded for a* Loria *hearing after the affirmance by the Court of Appeals on December 3, 1964. It seems unreasonable to conclude, however, that by its affirmance without opinion in* Mishkin *the Court of Appeals intended to, or did, effect a change in the* Loria *rule. Such a notion would be at odds with the language of both the majority and concurring opinions in* McQueen, *quoted supra note 4. Moreover, dissenting in* McQueen, *Chief Judge Desmond (with whom Judge Fuld concurred) emphasized that the case was the first in which the Court of Appeals had not insisted "that the current law, including changes shortly theretofore made, be enforced on appeal" (citing,* inter alia, *People v. Loria). People v. McQueen, supra, 18 N.Y.2d at 353, 274 N.Y.S.2d at 898–99, 221 N.E.2d at 559. While the logic supporting this course has been challenged (see People v. Kaiser, supra, 21 N.Y.2d at 97–98, 286 N.Y.S.2d at 810, 233 N.E.2d 818), the accuracy of Chief Judge Desmond's statement (with the sole exception of the present petitioner's case) has not been questioned. Finally, in People v. Huntley, 15 N.Y.2d 72, 255 N.Y.S. 2d 838, 204 N.E.2d 179 (1965), the Court of Appeals, holding Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), applicable to a defendant who had* exhausted the appellate process before *Jackson* was decided, remanded the case to the trial court for a hearing on the voluntariness of the defendant's confession, and announced that it would hold the appeal undecided to await the results of that hearing. In support of this procedure, adopted on the very day (January 7, 1965) the remittitur in *Mishkin* was amended, the Court cited (15 N.Y.2d at 76, 255 N.Y.S.2d at 841, 204 N.E.2d 179) People v. Coffey, 11 N.Y.2d 142, 227 N.Y. S.2d 412, 182 N.E.2d 92 (1962)—a case (based on *Loria*) which would have had no vitality had there already been a change in the law. Compare the citation of People v. Ostolaza, 19 A.D.2d 871, 244 N.Y.S.2d 96 (1st Dep't 1963), by the Appellate Division, Fourth Department, in People v. Feliciano, 23 A.D.2d 806, 258 N.Y.S.2d 319, a case decided on April 1, 1965, over a year after Mishkin's conviction was affirmed by the Court of Appeals.

6. As late as May 23, 1966, the Appellate Division, Second Department, denied the *coram nobis* application of a defendant who had been convicted on June 12, 1961 (seven days before *Mapp*) on the ground that appeal, not *coram nobis*, was the procedural route by which *Mapp* claims could be heard. (The *Mapp* question had been refused consideration on appeal because the defendant, unlike the petitioner here, had failed to object to the introduction of the allegedly tainted evidence at trial.) People v. Spero, 25 A.D.2d 882, 270 N.Y.S.2d 254 (2d Dep't 1966).

736

Mishkin explicitly invoked the benefits of *Loria* on his direct appeals to both the Appellate Division and the Court of Appeals.[7] Since neither Court wrote on the subject, it is not possible to know with certainty whether the contention was overlooked or rejected, though the latter course would have been flatly and inexplicably contrary to the law of the State at the time—i. e., prior to and following Mishkin's appeals. Chief Judge Fuld, in the dissent on the *coram nobis* appeal already quoted, said his Court had "inadvertently neglected" to give this petitioner the benefit of the *Loria* rule as it applied with undiminished force at the time of his direct appeal. The majority's *per curiam* questions neither the asserted inadvertence nor the Chief Judge's plainly sound view that *Loria* stated the law which should have governed the direct appeals.

There is objective ground, then, in the specific materials as well as the known character of the highest Court of the State where this court sits, requiring the judgment that it was oversight rather than capricious and purposeful deviation which accounted for the failure to treat Mishkin's appeals under the applicable *Loria* standard. And there is no third possibility—either in the perti-

nent opinions, or in the silent rulings, or in the submissions here of respondent's able counsel urging that petitioner's claims under *Mapp*, never yet heard on the merits, should be deemed permanently foreclosed.

Moreover, while it matters a great deal in terms of comity and the respect owed distinguished State Courts, it would make no constitutional difference whether petitioner was deprived of the *Loria* protections through neglect or intentional discrimination. Cf. Brady v. State of Maryland, 373 U.S. 83, 87–88, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); Levin v. Katzenbach, 124 U.S.App.D.C. 158, 363 F.2d 287, 290 (1966); United States ex rel. Meers v. Wilkins, 326 F. 2d 135, 137, 139 (2d Cir. 1964). In either event, the substance of the matter is an arbitrary deprivation of a vital procedural right, accorded to others similarly situated but denied to petitioner without any discernible or suggested reason.

None of this is meant to suggest, of course, that a State is forbidden to change its law, or, specifically, that the doctrine of the *Loria* decision was required to continue as a matter of federal constitutional law. What the State could not do, however, is single out this

7. In the Appellate Division, Mishkin argued that the alleged illegality of the various seizures was an "open" question, since *Loria* had held "that the doctrine of the *Mapp* case is applicable to all pending appeals." Brief for Appellant, pp. 19, 20, People v. Mishkin, 17 A.D.2d 243, 234 N.Y.S.2d 342 (1st Dep't 1962). The point was reinforced by the State's brief which, while claiming that the questioned seizures were valid, noted that if the Appellate Division reached "the conclusion that the record is sketchy relative to the seizure in the shops, a reversal of the judgment is not necessary. Rather, the solution in such a case is to withhold determination of the appeal and remit the matter to the *nisi prius* court for a hearing on the issue [People v. Coffey, 11 N.Y.2d 142 (1962)]." Brief for Respondent, p. 50, People v. Mishkin, 17 A.D.2d 243, 234 N.Y.S.2d 342 (1st Dep't 1962).

Mishkin's brief in the Court of Appeals repeated almost verbatim the arguments advanced in the Appellate Division, Brief for Defendant, pp. 14–15, 16, People v. Mishkin, 15 N.Y.2d 671, 255 N.Y.S.2d 881, 204 N.E.2d 209 (1964), and added the following:
"Because the case was tried before *Mapp* and *Marcus*, the subject of the illegal and inadequate search was not developed or explored by the court, although objection was made generally to the seizures * * *. The defendant, under the present state of the law should have received a favorable ruling to his objections with respect to the seizures or should have been permitted to develop his objections. See, People v. Coffey, 11 N.Y.2d 142 [22 N.Y.S.2d 412, 182 N.E.2d 92], where this court, as a minimum, remitted the issues of the seizures to the trial court."
Id. at 15.

petitioner, accidentally or purposely, and deny him procedural rights it accorded to others before, during and after his appeals. We live, after all, in a series of short runs. And the law must govern us accordingly. Thus, it may well be that a State, at some identifiable point in time, might decide to abolish some or all of its procedures for appellate review. See Griffin v. State of Illinois, 351 U.S. 12, 18, 76 S.Ct. 585, 100 L.Ed. 891 (1956); Frank v. Mangum, 237 U.S. 309, 327, 35 S.Ct. 582, 59 L.Ed. 969 (1915); cf. Thompson v. City of Louisville, 362 U.S. 199, 202, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960). But if it affords such remedies generally at some concrete point in time, it may not withhold them at that same time on arbitrary grounds, or on no grounds at all. Douglas v. People of State of California, 372 U.S. 353, 83 S. Ct. 814, 9 L.Ed.2d 811 (1963); Draper v. State of Washington, 372 U.S. 487, 83 S.Ct. 774, 9 L.Ed.2d 899 (1963); Lane v. Brown, 372 U.S. 477, 83 S.Ct. 768, 9 L.Ed.2d 892 (1963); Eskridge v. Washington Prison Board, 357 U.S. 214, 78 S.Ct. 1061, 2 L.Ed.2d 1269 (1958); Burns v. State of Ohio, 360 U.S. 252, 79 S.Ct. 1164, 3 L.Ed.2d 1209 (1959); Griffin v. State of Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956); Dowd v. United States ex rel. Cook, 340 U.S. 206, 208, 71 S.Ct. 262, 95 L.Ed. 215 (1951); Cochran v. Kansas, 316 U.S. 255, 257–58 (1942); cf. Cole v. State of Arkansas, 333 U.S. 196, 201–02, 68 S.Ct. 514, 92 L.Ed. 644 (1948); Frank v. Mangum, 237 U.S. 309, 327, 35 S.Ct. 582, 59 L.Ed. 969 (1915). And this is the essential point of petitioner's case for a hearing on the merits.

Although the equality of treatment required by the Fourteenth Amendment does not "assure uniformity of judicial decisions * * * [or] immunity from judicial error * * *" (Milwaukee Electric Ry. & Light Co. v. State of Wisconsin ex rel. Milwaukee, 252 U.S. 100, 106, 40 S.Ct. 306, 309, 64 L.Ed. 476 (1920), quoted in Beck v. State of Washington, 369 U.S. 541, 554–

55, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962)), "the central aim of our entire judicial system [is that] all people charged with crime must, so far as the law is concerned, 'stand on an equality before the bar of justice in every American court.'" Griffin v. State of Illinois, supra, 351 U.S. at 17, 76 S.Ct. at 590; cf. Yick Wo v. Hopkins, 118 U.S. 356, 373–74, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). The Equal Protection Clause "prohibits prejudicial disparities before the law. Under it a system which might be constitutionally unobjectionable, if applied to all, may be brought within the prohibition if some have more favorable treatment." Fay v. People of State of New York, 332 U.S. 261, 285, 67 S.Ct. 1613, 1626, 91 L.Ed. 2043 (1947).

An arbitrary discrimination such as that suffered by the petitioner here, although traditionally classified under the rubric of a denial of equal protection, may amount also to a deprivation of due process, since both concepts stem "from our American ideal of fairness * * *." Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954); cf. Wieman v. Updegraff, 344 U.S. 183, 191, 73 S.Ct. 215, 97 L.Ed. 216 (1952). Whatever else it has come to mean, the due process concept has its deepest roots in the idea summarized centuries ago by the demand for adherence to "the law of the land." See the Magna Carta, ch. 39; Buchalter v. People of State of New York, 319 U.S. 427, 429, 63 S.Ct. 1129, 87 L.Ed. 1492 (1943); In re Kemmler, 136 U.S. 436, 448–49, 10 S.Ct. 930, 34 L.Ed. 519 (1890). The meaning of that weighty phrase must be known in a finite world by reference to a time as well as a place. Random departures from the knowable law affording basic protections, whether they are effected purposely or "inadvertently," are patently offensive to this fundamental principle of our constitutional scheme.

In a different but apposite context, the Supreme Court has often held that an "unforeseeable and unsupported" de-

parture from existing state law does not constitute an adequate nonfederal ground of decision sufficient to preclude federal review. That familiar rule involves a "basic due process concept." Bouie v. City of Columbia, 378 U.S. 347, 354, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964); see Barr v. City of Columbia, 378 U.S. 146, 149, 84 S.Ct. 1734, 12 L. Ed.2d 766 (1964); N.A.A.C.P. v. Alabama, 377 U.S. 288, 296–297, 84 S.Ct. 1302, 12 L.Ed.2d 325 (1964); Wright v. State of Georgia, 373 U.S. 284, 291, 83 S.Ct. 1240, 10 L.Ed.2d 349 (1963); N.A.A.C.P. v. Alabama, 357 U.S. 449, 456–458, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); Staub v. City of Baxley, 355 U.S. 313, 319–320, 78 S.Ct. 277, 2 L.Ed. 2d 302 (1958); cf. Williams v. State of Georgia, 349 U.S. 375, 382–383, 75 S.Ct. 814, 99 L.Ed. 1161 (1955); Brinkerhoff-Faris Trust & Savings Co v. Hill, 281 U.S. 673, 680–682, 50 S.Ct. 451, 74 L.Ed. 1107 (1930).

In sum, whether the conclusion is rested upon the Equal Protection Clause, the Due Process Clause, or (justifiably) both, it is clear that in the peculiar circumstances of this case "prejudicial disparities" have been effected and "basic fairness" has not been achieved.

■■ As to the remedy, if this case involved a form of relief peculiarly and exclusively available in the state courts, it would be appropriate to confront the State with a choice between freeing the petitioner and affording him the remedial procedure. Griffin v. State of Illinois, supra, 351 U.S. at 19–20, 76 S.Ct. 585; Lane v. Brown, supra, 372 U.S. at 485, 83 S.Ct. 768; Dowd v. United States ex rel. Cook, supra, 340 U.S. at 209–210, 71 S.Ct. 262. But that is not the situation here. Petitioner seeks collateral relief of a kind available first from the State and then, in essentially identical form, in federal habeas. He has unsuccessfully sought from the State treatment "according to the procedure prevailing in ordinary cases * * *." Dowd, supra, 340 U.S. at 209, 71 S.Ct. at 264. The requirement of exhaustion, which is the only one really relevant in the last analysis, has been met. The underlying, and undoubtedly weighty, concern for comity cannot justify the exhaustion of prisoners with endless shuttling between state and federal courts. See Smith v. State of Kansas, 356 F.2d 654, 656 (10th Cir. 1966); Harvey v. State of Mississippi, 340 F.2d 263, 268 (5th Cir. 1965); Hunt v. Warden, Maryland Penitentiary, 335 F.2d 936, 940–941 (4th Cir. 1964); United States ex rel. Mercer v. Commonwealth of Pennsylvania, 310 F.2d 25, 29 (3d Cir. 1962); United States ex rel. De Negris v. Menser, 247 F.Supp. 826, 829 (D.Conn.1965), aff'd, 360 F.2d 199, 202 (2d Cir. 1966); Presley v. Pepersack, 228 F.Supp. 95, 98–100 (D.Md.1964), a pre-*Linkletter* decision, in which the petitioner, who had been convicted before *Mapp*, and whose "every reasonable effort to litigate the [*Mapp*] point" had been rebuffed in state post-conviction proceedings, was held to have exhausted state remedies. Cf. Bartone v. United States, 375 U.S. 52, 54, 84 S.Ct. 21, 11 L.Ed.2d 11 (1963). This petitioner should have—and, accordingly, has had —the hearing too long· delayed.[8]

### IV.

On the merits, after the years it has taken to reach them, the case now appears to be curiously simple. The court has held a brief hearing, at which only petitioner testified, and only briefly.

---

8. The foregoing conclusions make it unnecessary to pause more than passingly over another factor weighing against respondent's argument for a rule of "prospectivity" which would defeat petitioner without reaching the merits. As the Supreme Court observed on petitioner's appeal, and as appears further hereafter, "the search and seizure issue has a First Amendment aspect because of the alleged massive quality of the seizures * * *." 383 U.S. at 513, 86 S.Ct. at 966. Thus, the case is one on its face (and more basically than that, as it turns out) where petitioner might well have been entitled to relief without reference to *Mapp*, and, therefore, without reference to the doctrine of prospectivity attending that decision.

For the rest, the parties have stipulated that specified portions of the state trial record should be taken as the bulk of the record in this habeas proceeding. Upon the evidence thus adduced, petitioner has shown a massive police seizure of books without a warrant, and respondent has failed to sustain the heavy burden of reconciling that action with the First, Fourth and Fourteenth Amendments. These conclusions, elaborated in the discussion which follows, require granting of the writ of habeas corpus.

1. While other books seized from various bookstores, were used in petitioner's prosecution, it is necessary to treat here only the seizure of some thousands of books from a basement boiler room on January 12, 1960.[9] At petitioner's trial, the position of the prosecution on this subject was as follows:

(1) The search and seizure had been effected by means of a valid search warrant.

(2) The validity of the warrant did not matter anyhow because "[e]ven if the search were illegal, the evidence seized therein [was] * * * admissible."

■ With the elimination of the second proposition by Mapp v. State of Ohio, as this court has held it applicable to this case, it might have been supposed that our concern would center, at least in substantial part, upon the first. Cf. Mishkin v. State of New York, supra, 383 U.S. at 513, 86 S.Ct. 958. But things have developed differently. Counsel for respondent reports that the warrant is not available, and that it would not have passed muster under *Mapp* in any case. Abandoning that subject altogether, the State now claims that the seizures from the basement were valid because they

were made with the consent of one Norman Levenberg, petitioner's printer and accomplice. And it is undisputed that the burden of establishing such a justification is upon the State. See United States v. Como, 340 F.2d 891, 893 (2d Cir. 1965) ; Gatlin v. United States, 117 U.S.App.D.C. 123, 326 F.2d 666, 673 (1963) ; United States v. Page, 302 F.2d 81, 83 (9th Cir. 1962) ; Judd v. United States, 89 U.S.App.D.C. 64, 190 F.2d 649 (1951).

2. Levenberg, who printed the obscene books (as they have been found to be) for petitioner, operated his plant on the twelfth floor of a loft building at 37 West 20th Street in New York City. At petitioner's instance, beginning some months before the events in question, Levenberg rented a large room on the ninth floor of that building in which to store the books. The rent was paid by Levenberg as lessee with funds given to him by petitioner.

Around November of 1959, petitioner told Levenberg to try surreptitiously to "get rid" of the books in the ninth-floor room because the police were conducting surveillance and were expected to close in soon. Others in the building, including the superintendent, gave Levenberg similar intelligence. Levenberg proceeded fairly promptly to take a series of evasive actions. He "broke" the lease of his own premises in the building. Similarly, he abandoned the ninth-floor storage room and moved the books out of there. He transported the bulk of the books to a store newly rented by him in Brooklyn. He had the remainder taken to a basement boiler room in the 20th Street building, for the use of which, lacking the landlord's permission, he made a large "payoff" to the superintendent.

---

**9.** According to respondent, the books taken from bookstores formed the basis of counts on which petitioner received suspended sentences, or on which he has already served his sentences, so that there is a failure of habeas jurisdiction. Petitioner counters that the cumulative impact of all the books used against him precludes such analytical segregation now. But both parties agree that the writ should issue if the basement search may be considered and is found to have been unlawful. The court's view of these undisputed premises makes it unnecessary to go further.

Access to the basement was possible only by an elevator, the use of which required a key. The entrance to the boiler room was through an opening about 30″ by 30″ in dimensions, rendering storage and removal of book cartons a somewhat arduous task.

As has been mentioned, the removal of the books was accomplished by the police beginning on January 12, 1960. On that day, a police inspector arrived at the premises accompanied by five of his subordinates and armed with the now vanished warrant. They proceeded to the boiler room. Working from about 1:00 to 5:00 p. m. on that day and for another 4½ hours on the next day, they hauled away the thousands of books of concern here.

Levenberg was not present when the police arrived. He did not give them a key, without which (or its equivalent) they could not have made their way to the basement. The record is silent as to whether anyone gave them a key or they used some substitute device of their own. Levenberg arrived in the basement a substantial time after the police had begun to haul away the books.

█ In these circumstances, even if the effective "consent" of Levenberg could have justified what the police did, respondent's argument fails. There was no such consent, either timely given or actually sought or in fact relied upon by the police. Levenberg's testimony, which is all respondent offers on this critical issue (and which, as noted, confronts the police inspector's flat statement that it was a warrant which validated the search), tells that the police had been asking him to "cooperate" for some time before the seizure of January 12 and 13. The trial record shows that he did in fact come eventually to cooperate. But the critical and sufficient

point for now is his testimony that this decision was not made or conveyed to the police until Levenberg came to the basement after the seizure had started and the books were already being carried away (Tr. 363).

█ This is enough in itself to defeat the afterthought that it was consent rather than the invalid warrant upon which the police, the prosecutor or any other responsible person was relying at the material times in question.[10]

3. Because the case can go off on such narrow and sufficient grounds, there is no absolute necessity to reach a number of more troublesome questions apparent upon the face of the record. But the nature of the subject requires the court to note the severe doubts about respondent's position even if his consent theory were more plausible.

We are concerned with a huge seizure of *books*, now sought to be justified by the alleged consent of the printer, based upon a police judgment of obscenity. It is undisputed that the target of the search was petitioner, for whom the printer worked, and that petitioner never consented, or authorized Levenberg to consent, to the seizure.

In these circumstances, nothing said above is meant to suggest that Levenberg's clear and timely consent, had he given it, could have legalized what the police did. Cf. United States v. Brown, 274 F.Supp. 561, 565 (S.D.N.Y.1967). In this sensitive area of First Amendment concern, it would be strong doctrine indeed to hold that a man's printer may validate a police seizure of his stored books or other writings. The suggested theory recalls dramatic chapters of history that are at the heart of what both the First and the Fourth Amendments are about. See Marcus v. Search Warrant, 367 U.S. 717, 724–729,

10. In so far as the record might be thought to be ambiguous on the question of consent, such ambiguity would in no way strengthen respondent's case. The consent necessary to validate a warrantless search must be so "unequivocal, specific, and intelligently given" as to constitute

"an understanding and intentional waiver of a constitutional right." United States v. Como, 340 F.2d 891, 893 (2d Cir. 1965); Johnson v. United States, 333 U. S. 10, 13, 68 S.Ct. 367, 368, 92 L.Ed. 436 (1948). The record here fails to approach any such positive showing.

81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961); Stanford v. State of Texas, 379 U.S. 476, 482–485, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965); Landynski, Search and Seizure and the Supreme Court 20–25 (1966). "The Bill of Rights was fashioned against the background of knowledge that unrestricted power of search and seizure could * * * be an instrument for stifling liberty of expression. For the serious hazard of suppression of innocent expression inhered in the discretion confided in the officers authorized to exercise the power." *Marcus*, supra, 367 U.S. at 729, 81 S.Ct. at 1715.[11]

Furthermore, assuming a printer could release to law enforcement officers a copy or so of an allegedly obscene publication, the scope of the seizure here raises further questions of a grave nature. See Mishkin v. State of New York, supra, 383 U.S. at 513, 86 S.Ct. 958. The police took scores or hundreds, and even thousands, of single works stored in the basement. From January 12 and 13, at least until March 8, 1960, when the District Attorney filed his information, there was no official notice to petitioner of this dragnet operation. We must be "realistic," of course. The record made since those days shows quite clearly that petitioner knew what was happening, that he was not keen to litigate, and that his books were on the wrong side of the "finely drawn" "line between speech unconditionally guaranteed and speech which may legitimately be regulated, suppressed, or punished * * *." Mar-

cus v. Search Warrant, supra, 367 U.S. at 731, 81 S.Ct. at 1716. Nevertheless, if the First and Fourth Amendments are to be preserved intact, there is no room in them to except cases in which their protections appear by hindsight to have been "undeserved" or "unnecessary." The protections are for all of us, bad men no less than good. The printer's "consent" which today yields up masses of "illicit merchandise" designed for "titillation by pornography," Ginzburg v. United States, 383 U.S. 463, 475, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966), may be judged by policemen tomorrow to justify wholesale confiscation from the printing plant of political tracts or works of art. Cf. Stanford v. Texas, supra, 379 U.S. at 479–480, 485, 85 S.Ct. 506, 13 L.Ed.2d 431.

■ When he trenches upon the area presumptively protected by the First Amendment, a policeman, no less than a legislator, must act with "narrow specificity." N.A.A.C.P. v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). A massive seizure, undertaken to prevent the dissemination of allegedly obscene books, does not suffice where "the end can be more narrowly achieved." Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960). See also Bantam Books, Inc., v. Sullivan, 372 U.S. 58, 66, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963); Speiser v. Randall, 357 U.S. 513, 525, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958); Kingsley

11. "To help enforce the licensing system [in Tudor England], vast powers of search were conferred on those engaged in ferreting out violators and evidence. The Stationers' Company, a private guild organization, was incorporated under Mary in 1557 and, in return for monopoly privileges over printing granted to its members, was instructed 'to make search wherever it shall please them in any place * * * within our kingdom of England * * * and to seize, take hold, burn * * * those books and things which are or shall be printed contrary to the form of any statute, act, or proclamation. * * *' In delegating the search power to the printers themselves, the monarchy effectively silenced possible op-

position by the printing trade to the enforcement of the licensing provisions. For nearly a century, until the decline and fall of the monarchy in the 1640's, the Company assumed the main responsibility of enforcement. Its zeal in making the licensing system effective was motivated solely by self-gain; in searching for non-licensed printing its members were, in effect, protecting their own monopoly rights. As was therefore to be expected, their effectiveness as official searchers over the years waxed and waned in proportion to the extent that their own interests were being served by the licensing system." Landynski, op. cit. supra at 21.

Books, Inc. v. Brown, 354 U.S. 436, 441, 77 S.Ct. 1325, 1 L.Ed.2d 1469 (1957).

It seems fair to say, in short, that if the evidence of Levenberg's consent were more adequate than it is, the decision in this proceeding would probably be no different. The enormous haul of books from the 20th Street basement could not have been authorized by a search warrant. See A Quantity of Books v. Kansas, 378 U.S. 205, 210, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964); Marcus v. Search Warrant, supra, 367 U.S. at 731–733, 735, 81 S.Ct. 1708, 6 L.Ed.2d 1127. Cf. Stanford v. State of Texas, 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965); Flack v. Municipal Court, Cal., 59 Cal.Rptr. 872, 429 P.2d 192 (1967). It seems unlikely that a printer could supply the requisite authority when the police, knowing the target of their work, carefully avoid any approach to the seeking of consent from him.

■ In addition, the procedure would appear to have violated the now settled requirement that seized materials *prima facie* within the protections of the First Amendment must be subjected to speedy *judicial* judgment if the power to block their dissemination is not to be permanently nullified. Freedman v. Maryland, 380 U.S. 51, 58, 85 S. Ct. 734, 13 L.Ed.2d 649 (1965); A Quantity of Books v. Kansas, supra, 378 U.S. at 210–211, 213, 84 S.Ct. 1723, 12 L.Ed.2d 809; Bantam Books, Inc., v. Sullivan, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963); Marcus v. Search Warrant, supra, 367 U.S. at 731–733, 735, 737, 81 S.Ct. 1708; cf. Kingsley Books, Inc. v. Brown, 354 U.S. 436, 437, 439, 440, 77 S.Ct. 1325, 1 L.Ed.2d 1469 (1957).

The petition is granted. The court orders today the termination of petitioner's confinement.[12] Since respondent has conceded that a retrial is not possible if this decision stands, there is no occasion to provide for further state proceedings as an alternative to this disposition. This order will be stayed, however, (a) for 20 days, allowing that period for the filing of a notice of appeal, and (b) thereafter during the pendency of respondent's appeal, if he prosecutes one, to the Court of Appeals.[13]

The foregoing embodies the court's order. No settlement is required.

---

12. Petitioner was freed on bail by order of this court on March 25, 1968. Under the disposition hereinafter prescribed, he will remain in that status while this court's order is stayed.

13. Rule 22(b) of the Federal Rules of Appellate Procedure, scheduled to become effective on July 1, 1968, makes clear that "a certificate of probable cause is not required" when the "state or its representative" appeals from the granting of habeas corpus. As of this moment, however, the rule in our Court of Appeals seems to require such a certificate. United States ex rel. Carrol v. La Vallee, 2 Cir., 342 F.2d 641 (1965). To avoid any doubt or unnecessary delay, the certificate is hereby granted.