**UNITED STATES of America ex rel. John BUONORABA, Dominick D'Amico, Dominick Pilotta, Joseph Sarcinella, John Varone, Leonard Vento, Rudolph Santabello and Alfred Mauriello, Petitioners-Relators,**

v.

**COMMISSIONER OF CORRECTION, CITY OF NEW YORK, Respondent.**

**No. 70 Civ. 3013.**

United States District Court, S. D. New York.

Aug. 11, 1970.

Irving Anolik, New York City, for petitioners-relators.

Frank S. Hogan, Dist. Atty., New York County, for respondent; Lewis R. Friedman, Asst. Dist. Atty., of counsel.

## OPINION

MacMAHON, District Judge.

Each of the petitioners is currently serving a ninety-day sentence for contempt following indictment, trial and conviction before three judges in the Criminal Court of the City of New York for violation of former New York Penal Law § 600(6) (McKinney's Consol.Laws. c. 40, 1944), for refusing to answer questions before a grand jury after being granted immunity under former New York Penal Law § 2447 (McKinney 1966). Each challenges the validity of his conviction under the Fifth, Sixth and Fourteenth Amendments on the grounds that: (1) he was never brought before a judge and directed to answer the prosecutor's questions after he had invoked the Fifth Amendment; (2) he was neither permitted, nor advised of his right, to leave the grand jury room and consult with his lawyer who was present outside and (3) he was denied his right to a jury trial.

The convictions were affirmed by the Appellate Term, First Department. Leave to appeal to the Court of Appeals was granted, and the claims made here were urged and unanimously rejected there without opinion. Application for a stay pending filing of a petition for certiorari was denied on June 29, 1970 by Mr. Justice Harlan.

There are no issues of fact so we proceed at once to the merits.

*Lack of Judicial Direction to Answer*

During the course of an investigation into a conspiracy to bribe labor representatives and related crimes, the New York County grand jury subpoenaed petitioners, among other witnesses. Each was accompanied by an attorney who waited outside the grand jury room. An Assistant District Attorney explained the purposes of the proceeding and advised each petitioner that he could refuse to answer questions on the ground of possible self-incrimination and that, if he refused to answer on that ground and the Assistant asked the Foreman to direct him to answer and he were so directed, the witness would be granted immunity from prosecution. The Assistant further explained the scope of the immunity and stated that once it was granted no prosecution could be had for any crimes disclosed as a result of an answer except for perjury, or, if the witness persisted in his refusal, contempt.

Petitioners Sarcinella, Pilotta and Coppabianca said their attorney had explained their rights to them and that they understood the Assistant's explanation; Mauriello said his attorney had not explained his rights to him but acknowledged that he understood the Assistant's explanation; the remaining petitioners, claiming possible self-incrimination, refused to answer whether they had been advised of their rights or whether they understood the Assistant's explanation.

Each petitioner was then asked at least four questions as to whether he was employed by Service Loading Corporation or had been paid for working for that company when in fact he had performed no services. Each refused to answer. The Foreman of the grand jury, upon the Assistant's request, in accordance with a vote previously taken, directed each petitioner to answer. Each persisted in his refusal. After these refusals, the fact that immunity had been tendered was again explained by the Assistant.

No petitioner raised any question about the scope of his privilege or of the immunity to be conferred. Nor was any claim made of lack of understanding of the question; nor of its relevance or materiality. None asked to be brought before a judge for any reason; nor to leave the grand jury room to consult

with his counsel; nor were any advised of their right to do so by the Assistant.

The grand jury and the Assistant had satisfied all the procedural prerequisites for conferral of immunity under former Penal Law § 2447.[1] If a petitioner had answered, he would have acquired immunity from prosecution "for or on account of any transaction, matter or thing concerning which * * * he gave answer or produced evidence."[2] Each would thus have "obtained an immunity from prosecution for any and all crimes to which their testimony might relate and accordingly could not assert the privilege against self incrimination and refuse to testify."[3] There can be no question that each petitioner, "after being sworn, [refused] to answer any legal and proper interrogatory."[4]

Petitioners now claim that they were deprived of due process because, after they refused to comply with the Foreman's directions to answer, they were not taken before a judge to have their rights explained to them and to be directed to return to the grand jury room and answer the questions.

### The Applicable Statutes

Former Penal Law § 600(6) provides:

"A person who commits a contempt of court, of any one of the following kinds, is guilty of a misdemeanor:

\* \* \* \* \* \*

Contumacious and unlawful refusal to be sworn as a witness, or, after being sworn, to answer any legal or proper interrogatory; * * *"

Former Penal Law § 2447 provides:

"1. In any investigation or proceeding where, by express provision of statute, a competent authority is authorized to confer immunity, if a person refuses to answer a question or produce evidence of any other kind on the ground that he may be incriminated thereby, and, notwithstanding such refusal, an order is made by such competent authority that such person answer the question or produce the evidence, such person shall comply with the order. If such person complies with the order, and if, but for this section, he would have been privileged to withhold the answer given or the evidence produced by him, then immunity shall be conferred upon him, as provided for herein.

2. 'Immunity' as used in this section means that such person shall not be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which, in accordance with the order by competent authority, he gave answer or produced evidence, and that no such answer given or evidence produced shall be received against him upon any criminal proceeding. But he may nevertheless be prosecuted or subjected to penalty or forfeiture for any perjury or contempt committed in answering, or failing to answer, or in producing or failing to produce evidence, in accordance with the order, and any such answer given or evidence produced shall be admissible against him upon any criminal proceeding concerning such perjury or contempt.

3. 'Competent authority' as used in this section means:

\* \* \* \* \* \*

(c) The grand jury before which a person is called to answer questions or produce evidence, when such grand jury is expressly requested by the prosecuting attorney to order such

1. People v. Ianniello, 21 N.Y.2d 418, 427, 288 N.Y.S.2d 462, 235 N.E.2d 439, cert. denied, 393 U.S. 827, 89 S.Ct. 90, 21 L.Ed. 2d 98 (1968); People v. Laino, 10 N.Y.2d 161, 172–174, 218 N.Y.S.2d 647, 176 N.E.2d 571 (1961).

2. Former N.Y. Penal Law § 2447 (McKinney 1966).

3. Matter of Gold v. Menna, 25 N.Y.2d 475, 481–482, 307 N.Y.S.2d 33, 38, 255 N.E.2d 235, 240 (1969).

4. Former N.Y. Penal Law § 600(6) (McKinney 1944).

person to give answer or produce evidence; * * * "

In affirming petitioners' convictions, the New York Court of Appeals followed earlier New York cases construing these statutes, which have consistently held that as long as the statutory formula for conferring immunity under former Penal Law § 2447 is followed, as it was here, the grand jury has power to order the witness to respond to "any legal or proper" question under pain of contempt without a further directive or order from the court.[5] This construction of the New York statutes by the highest court of the state raises the question of whether petitioners were deprived of due process when they were indicted, tried and convicted of criminal contempt, although no court ever ordered or directed them to answer the grand jury's questions.

■ We note at the outset that the state procedure differs from federal practice, which entitles a witness before a grand jury to persist in his refusal free from contempt until the court orders him to answer.[6] States, however, have wide latitude to fashion their own rules of criminal procedure. The Due Process Clause of the Fourteenth Amendment requires that these procedures be fundamentally fair in all respects, but it does not impose on the states the rules that may be in force in the federal courts, except where such rules are also found to be essential to basic fairness.[7] As

Mr. Justice Cardozo observed, a state rule of law "does not run foul of the Fourteenth Amendment because another method may seem to our thinking to be fairer or wiser or to give a surer promise of protection to the prisoner at the bar."[8]

The Fourteenth Amendment denies the states the power to "deprive any person of life, liberty or property without due process of law." Many of the rights guaranteed by the first eight amendments to the Constitution have been held to be protected against state action by the Due Process Clause, including the Sixth Amendment's right to counsel, to a speedy and public trial, to confrontation of opposing witnesses and to compulsory process for obtaining witnesses.[9]

The test for determining whether a right extended by the Fifth and Sixth Amendments with respect to federal criminal proceedings is also protected against state action by the Fourteenth Amendment has been phrased in a variety of ways. Federal courts seek to determine whether a right is among those "fundamental principles of liberty and justice which lie at the base of all our civil and political institutions," [10] whether it is "basic in our system of jurisprudence," [11] and whether it is "a fundamental right, essential to a fair trial." [12]

Petitioners fail to demonstrate how they have been deprived of any of these essential rights or how there is anything fundamentally unfair in New York's

5. People v. Chestnut, 26 N.Y.2d 481, 311 N.Y.S.2d 853, 260 N.E.2d 501, n. 2 (June 4, 1970) ; People v. Ianniello, *supra*, 21 N.Y.2d at 423–426, 288 N.Y.S.2d 462, 235 N.E.2d 439 ; People v. Riela, 9 A.D. 2d 481, 195 N.Y.S.2d 558 (3d Dep't 1959), rev'd on other grounds, 7 N.Y.2d 571, 200 N.Y.S.2d 43, 166 N.E.2d 840, reargument denied, 8 N.Y.2d 1008, 205 N. Y.S.2d 352, 169 N.E.2d 439, cert. denied, 364 U.S. 915, 81 S.Ct. 275, 5 L.Ed.2d 228, rehearing denied, 364 U.S. 944, 81 S. Ct. 458, 5 L.Ed.2d 375 (1960).

6. Shillitani v. United States, 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966) ; Harris v. United States, 382 U.S. 162, 86 S.Ct. 352, 15 L.Ed.2d 240 (1965).

7. Spencer v. Texas, 385 U.S. 554, 564, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967).

8. Snyder v. Massachuetts, 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934).

9. Duncan v. Louisiana, 391 U.S. 145, 148, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

10. Powell v. Alabama, 287 U.S. 45, 67, 53 S.Ct. 55, 63, 77 L.Ed. 158 (1932).

11. In re Oliver, 333 U.S. 257, 273, 68 S.Ct. 499, 507, 92 L.Ed. 682 (1948).

12. Gideon v. Wainwright, 372 U.S. 335, 343–344, 83 S.Ct. 792, 796, 9 L.Ed.2d 799 (1963).

procedures for initiating prosecutions for criminal contempt when subpoenaed witnesses persist in refusing to answer proper questions by a grand jury after a grant of full immunity and specific direction. Contempts before investigative bodies, including congressional committees, without court intervention until trial have deep roots in our history.[13] Indeed, it can be argued that the procedures accorded petitioners by the state of New York are fairer and give promise of greater protection of constitutional rights than the procedure urged by petitioners "whereby a contempt already completed out of the court's presence may be reproduced in a command performance before the court to justify summary disposition." [14]

We are not dealing here with summary contempt. The role of the grand jury was not to determine whether petitioners had committed a contempt but simply to lay the basis for the initiation of criminal contempt proceeding by indictment. The ultimate determination of whether petitioners were guilty of wilful contempt and decision of such subsidiary questions as relevance of the questions, scope of the immunity, specific direction to answer and fair warning were not decided by laymen but by three trained judges upon a plenary trial. Thus, the procedure here not only gave petitioners all of the safeguards of notice, bail, opportunity to prepare a defense, representation by counsel, a speedy and public trial, confrontation of opposing witnesses and compulsory process, but also of the presumption of innocence, proof beyond a reasonable doubt of deliberate, intentional refusal to answer[15] and other rights basic to due process.

Under the applicable state statutes, the contempt was complete upon the petitioners' persistent refusal to answer the questions before the grand jury. There was no need for the prosecutor to take the petitioners, who had already committed contempt outside of the presence of the court, to repeat the action before the court, as there might have been under the federal practice in order either to subject petitioners to summary civil contempt by order of a judge[16] or to cite them for criminal contempt by order to show cause or arrest under Rule 42(b), Fed.R.Crim.P.

Nor was there anything in the grand jury proceedings here which required the intervention of a judge. There was no challenge to the authority of the grand jury to confer immunity in an investigation covering the crimes then under investigation.[17] Clearly, any such challenge would have been futile for the grand jury was "a competent authority to grant immunity." [18] The witnesses were informed that immunity had been offered and would be granted if they answered the questions.[19]

No question was raised by any petitioner about the relevancy of any question or the scope of the immunity to be conferred. Indeed, there was no challenge upon the trial or even now as to the legality and propriety of the questions or the granting of full transactional

---

13. See 2 U.S.C. § 192, derived from an Act of 1857; Quinn v. United States, 349 U.S. 155, 160, 75 S.Ct. 668, 99 L.Ed. 964 (1955); In re Chapman, 166 U.S. 661, 665, 17 S.Ct. 677, 41 L.Ed. 1154 (1897).

14. See Brown v. United States, 359 U.S. 41, 54, 79 S.Ct. 539, 549, 3 L.Ed.2d 609 (1959) (dissenting opinion of Mr. Chief Justice Warren, joined by Mr. Justice Black, Mr. Justice Douglas and Mr. Justice Brennan), overruled, Harris v. United States, 382 U.S. 162, 86 S.Ct. 352, 15 L.Ed.2d 240 (1965).

15. Quinn v. United States, supra, 349 U.S. at 165, 75 S.Ct. 668, 99 L.Ed. 964.

16. Shillitani v. United States, supra.

17. Matter of Gold v. Menna, supra, 25 N.Y.2d 475 at 480, 307 N.Y.S.2d 33, 255 N.E.2d 235.

18. Former N.Y. Penal Law § 2447(3) (c) (McKinney 1966); People v. Riela, supra, 9 A.D.2d 481 at 483–484, 195 N.Y.S.2d 588.

19. People v. Franzese, 16 A.D.2d 804, 228 N.Y.S.2d 644 (3d Dep't), aff'd, 12 N.Y.2d 1039, 239 N.Y.S.2d 682, 190 N.E. 2d 25 (1963).

immunity. Petitioners show no "entrapment," no lack of understanding, no lack of warning, no prejudice and no fundamental unfairness in anything that occurred during the grand jury proceedings.

In summary, there simply were no questions raised before the grand jury requiring adjudication, and there is nothing in the statutes nor in the requirement of procedural due process which requires the futile act of repeating their refusal to answer proper questions before a judge. As the Supreme Court put it years ago, "it is not asking too much that the burden of showing essential unfairness be sustained by him who claims such injustice and seeks to have the result set aside, and that it be sustained not as a matter of speculation but as a demonstrable reality." [20]

There is no such showing here. We hold, therefore, that petitioners were not deprived of due process.

### Opportunity to Consult with Counsel

Each of the petitioners was represented by an attorney who was outside the grand jury room when the petitioner testified. None ever requested permission to speak with counsel, raised any question concerning the granting of immunity or objected to answering any questions, except to invoke the privilege against self-incrimination.

■ Relying on Escobedo v. Illinois[21] and Miranda v. Arizona,[22] petitioners claim that the prosecutor was required to tell them of their right to counsel and their right to leave the grand jury room to consult with him. Escobedo and Miranda are inapposite for they rest on the necessity for procedures which assure that an individual is accorded his privilege under the Fifth Amendment not to be compelled to incriminate himself. The immunity conferred here supplied a fully effective equivalent of the Escobedo and Miranda warnings since it obviated any possible self-incrimination. There is, therefore, no necessity for warnings other than of the danger of contempt, nor is there necessity for consultation with counsel.

■ Moreover, petitioners were mere witnesses before the grand jury and, as such, had no constitutional right to be represented by counsel in the technical sense.[23] A witness before a grand jury may be allowed to consult with counsel about his right to refuse to answer questions as a matter of fairness, but that right need not be surrounded with the same safeguards as the right of an accused in police custody to consult with counsel and surely not where the witness has been granted full immunity. Thus, the rationale of constitutional decisions such as Escobedo and Miranda does not apply to witnesses appearing before the grand jury.[24]

Petitioners' contention that they were denied effective assistance of counsel is, therefore, without merit.

### Failure to Grant Jury Trial

Relying on Duncan v. Louisiana,[25] Baldwin v. New York[26] and Williams v. Florida,[27] which mandate a jury trial in state courts for any crime punishable by imprisonment for more than six months, petitioners contend that they

20. Adams v. United States ex rel. McCann, 317 U.S. 269, 281, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942).

21. 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed. 2d 977 (1964).

22. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966).

23. In re Groban, 352 U.S. 330, 332–333, 77 S.Ct. 510, 1 L.Ed.2d 376 (1957); In re Black, 47 F.2d 542 (2d Cir. 1931); People v. Ianniello, supra, 21 N.Y.2d at 424, 288 N.Y.S.2d 462, 235 N.E.2d 439.

24. United States v. DiMichele, 375 F.2d 959 (3d Cir. 1967); United States v. Winter, 348 F.2d 204 (2d Cir. 1965).

25. 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed. 2d 491 (1968).

26. 399 U.S. 66, 90 S.Ct. 1886, 26 L.Ed. 2d 437 (June 22, 1970).

27. 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed. 2d 446 (June 22, 1970).

were entitled to a jury trial for the crime of contempt, a misdemeanor punishable by not more than one year in prison.[28] The one-year sentence, it is urged, precludes the designation of the misdemeanor as a "petty offense" for which a jury trial is not constitutionally mandated.

■ The claim that these petitioners were denied their constitutional right to a trial by jury is without merit. Their trial began on April 29, 1968. The Supreme Court has recently held that the Sixth Amendment right to a jury trial, which was first made applicable to the states in Duncan v. Louisiana, *supra,* does not apply where the trial began prior to May 20, 1968, the date *Duncan* was decided. The recent decision in Baldwin v. New York, *supra,* does not require a different result. The point was recently decided against petitioners' contention by the New York Court of Appeals in People v. Dargan.[29] We agree with that court's decision. The court said:

> "There is ample precedent for holding that the *Baldwin* case, not any prior case, is the appropriate landmark in determining which cases should be affected by the new rule. The courts, both Federal and State, have often chosen the date of the new decision, not previous cases on which it was based, as the starting date for its applicability (see Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106; Tehan v. Shott, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453; Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694; DeStefano v. Woods, 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308. See, also, People v. Morhouse, 21 N.Y.2d 66, 77, 286 N.Y.

S.2d 657, 665, 233 N.E.2d 705, 711; People v. Kaiser, 21 N.Y.2d 86, 286 N.Y.S.2d 801, 233 N.E.2d 818, aff'd 394 U.S. 280, 89 S.Ct. 1044, 22 L.Ed.2d 274). Accordingly, the recent decision of the United States Supreme Court in Baldwin v. New York, *supra* should be applied only to those trials commencing on or after the date of that decision, June 22, 1970."

■ Determining whether a new constitutional standard should be granted retroactive or prospective application turns on three factors: (1) the purpose to be served by the new standard; (2) the extent of reliance by law enforcement authorities on the old standard and (3) the effect on the administration of justice of a retroactive application of a new standard.[30]

These circumstances, we think, call for the application of *Baldwin* starting with the date of that decision. There can be no question that a contrary ruling would result in drastic disruption of the administration of justice. Thousands of convictions entered before *Baldwin* would be needlessly overturned and the cases reopened. This would result in chaos totally unjustified by any concern that the fact-finding process here, in a trial before three impartial judges, one of whom dissented, was unreliable.

There can be no doubt that New York state courts, prosecutors and other officials have relied with justification on a conclusion that a jury trial was not constitutionally required in misdemeanor cases in the New York City Criminal Court. Bench trials have their roots deep in New York's history and have been undisturbed by the Supreme Court from the inception of the state.

28. Former N.Y. Penal Law § 600 (McKinney 1944).

29. 26 N.Y.2d 100, 313 N.Y.S.2d 712, 261 N.E.2d 633 (July 2, 1970).

30. See Desist v. United States, 394 U.S. 244, 256, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969); De Stefano v. Woods, 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968); Roberts v. Russell, 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100 (1968); Stovall v. Denno, 388 U.S. 293, 300, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966); United States v. Vallejo, 312 F.Supp. 244, (S.D.N.Y.1970).

Accordingly, we conclude that *Baldwin* is not to be applied retroactively and that petitioners were therefore not entitled to a jury trial.

### Equal Protection

Finally, petitioners argue that the state's denial of a jury trial to misdemeanants tried in New York City, while granting a six-man jury for trial of identical offenses in the rest of the state, denies equal protection.[31] This question was left open in *Baldwin*, but the problem is now largely academic because, in response to *Baldwin*, six-man juries are now granted for such crimes tried in the city. It is not academic, however, for these petitioners who were tried before the new rule.

■ Exact equality is no prerequisite of equal protection of the laws within the meaning of the Fourteenth Amendment.[32] Rather, the Fourteenth Amendment only forbids classifications involving "invidious discrimination,"[33] which is defined as a classification which is arbitrary, irrational and not reasonably related to a legitimate purpose.[34]

■ Petitioners' equal protection argument rests on the thesis that because New York State provides a six-man jury somewhere in the state it must do so everywhere. This argument is untenable.

"Although no precise formula has been developed, the Court has held that the Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it."[35]

Here, the legislative classification is territorial, and "territorial uniformity is not a constitutional prerequisite."[36]

In Salsburg v. Maryland,[37] the Supreme Court quoted from an opinion in an earlier case which disposes of petitioners' contention:

"[T]here is nothing in the Constitution to prevent any State from adopting any system of laws or judicature it sees fit for all or part of its territory. If the State of New York, for example, should see fit to adopt the civil law and its method of procedure for New York City and the surrounding counties, and the common law and its method of procedure for the rest of the State, there is nothing in the Constitution of the United States to prevent its doing so. * * * Where part of a State is thickly settled, and another part has but few inhabitants, it may be desirable to have different systems of judicature for the two portions,—trial by jury in one, for example, and not in the other. Large cities may require a multiplication of courts and a peculiar arrangement of jurisdictions. It would be an unfortunate restriction of the powers of the State government if it could not, in its dis-

---

31. Compare N.Y.C.Crim.Ct.Act § 40 (McKinney Supp.1969) with N.Y. Uniform Dist.Ct.Act § 2011 (McKinney 1963); N.Y. Uniform City Ct.Act § 2011 (McKinney Supp.1969).

32. Norvell v. Illinois, 373 U.S. 420, 423, 83 S.Ct. 1366, 10 L.Ed.2d 456 (1963).

33. Ferguson v. Skrupa, 372 U.S. 726, 732, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963).

34. McLaughlin v. Florida, 379 U.S. 184, 191, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964).

35. McGowan v. Maryland, 366 U.S. 420, 425–426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961).

36. *Id.* at 427, 81 S.Ct. at 1106.

37. 346 U.S. 545, 74 S.Ct. 280, 98 L.Ed. 281 (1954).

cretion, provide for these various exigencies." [38]

The requirement of state-wide uniformity in criminal procedures would inhibit progress in the administration of justice. A state should not be forbidden from employing new or different procedures in certain parts of the state, either as an experiment or because of particular local conditions. Surely, a defendant arrested at night in upstate New York would not be denied equal protection because the experimental night arraignment program recently inaugurated in New York City is not available in his locality.[39] Similarly, to ease the burdens on the police and courts, the New York City Criminal Court adopted a rule permitting a summons instead of arrest for persons charged with offenses below the grade of felony committed within the City.[40] Surely, one arrested for such a misdemeanor in Syracuse could not claim denial of equal protection because this procedure has not been adopted there.

The classification here, we think, is reasonably related to a legitimate purpose.

■■■ New York City is sui generis.[41] Pressures inherent in an enormous cosmopolitan population crowded into a tiny geographical area, coupled with oppressive economic and social conditions suffered by many, spawn crime at an ever-increasing rate.

The administrative advantages, recognized even in the Colonial period, of trials of misdemeanors without juries continue.[42] As New York City grew and caseloads multiplied, congestion placed severe strains on the lower criminal court in the City. The Chief Justice complained that the Court was being overtaxed in 1954 when he pointed to the previous year's calendar of 32,000 cases and to an increase of 150% in its business between 1945 and 1950.[43] The problem grew from bad to worse. Enormous increases in crime in the 1960's, as well as a proliferation of hearings on the validity of searches and seizures, confessions and eye-witness identifications, have resulted in delay inherent in long calendars and congested dockets.[44]

As any trial judge sitting in New York City knows, jury trials consume far more time and considerable extra personnel, money and courtrooms than non-jury trials. Clearly, jury trials contribute much to delay.

The problem of court congestion and the expense in administering justice in the lower courts are inherently harder to resolve in New York City than anywhere else in the state. The City's population density, a factor directly associated with crime,[45] is more than twice Buffalo's, the second largest city.[46] The City is the national center for narcotics and traffic in drugs—almost half of the nation's addicts are here, more than fifty times as many as live in Buffalo—[47] and

38. Missouri v. Lewis, 101 U.S. 22, 31–32, 25 L.Ed. 989 (1879), quoted at 346 U.S. 551, n. 6, 74 S.Ct. 283. See also Ohio ex rel. Bryant v. Akron Metropolitan Park Dist., 281 U.S. 74, 81, 50 S.Ct. 228, 74 L.Ed. 710 (1930) ; Ocampo v. United States, 234 U.S. 91, 98–99, 34 S.Ct. 712, 58 L.Ed. 1231 (1914).

39. Cf. N.Y.C.Crim. Justice Coordinating Council, 18-Month Report, N.Y.L.J., Feb. 5, 1969, p. 4, col. 4.

40. 22 NYCRR § 2950.10(a).

41. See United States v. Manufacturers Hanover Trust Co., 240 F.Supp. 867, 887–891 (S.D.N.Y.1965).

42. See Murphy v. People, 2 Cow. (N.Y.) 815 (1824).

43. N.Y. Times, Jan. 3, 1954, at 34, col. 1.

44. N.Y. Post, Oct. 13, 1969, at 37.

45. President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society, at 5, 28 (1967).

46. U.S. Census, Statistical Abstract 1968, at 21, Table 20; Rand-McNally Population Estimates, Commercial Atlas & Marketing Guide 31 (100th ed. 1969).

47. U.S.Treas.Dept., Bureau of Narcotics, Traffic in Opium and Other Dangerous Drugs for Period Ended December 31, 1967, at 47, 52.

it suffers from the other crimes that addiction produces. As the transportation and financial center of the state and nation, it faces special problems of law enforcement.

The result, as the Court of Appeals noted in Matter of Hogan v. Rosenberg,[48] is that the Criminal Court of the City of New York is burdened with misdemeanor calendars far heavier than those found elsewhere in the state. In Buffalo, the City Court disposed of 8,189 non-traffic misdemeanor cases in a recent thirty-month period for which figures are available; in the comparable period the New York City Criminal Court disposed of 321,368 non-traffic misdemeanor cases.[49] Surely, the New York legislature could reasonably conclude that the problems of administering justice in the lower courts are most urgent in New York City and therefore require different procedures from those employed elsewhere in the state.

The Supreme Court has recognized these considerations as valid in the case of petty offenses, noting that a legislature may rationally conclude that "the possible consequences to defendants from convictions for petty offenses" are "insufficient to outweigh the benefits to efficient law enforcement and simplified judicial administration resulting in the availability of speedy and inexpensive non-jury adjudications"[50] and that juries may be dispensed with in trials of petty offenses in cities with unique problems of court congestion, expense and delay.

The rational basis for the New York legislature's territorial classification is not vitiated by the fact that we deal here not with petty offenses but with a misdemeanor punishable by not more than one year in prison, even though *Duncan* mandates a jury trial in the latter case. As was said in Norvell v. Illinois,[51] "the 'rough accommodations' made by government do not violate the Equal Protection Clause of the Fourteenth Amendment unless the lines drawn are 'hostile or invidious.' " Clearly, the classification here is reasonably justified by the facts and a legitimate legislative objection and, therefore, does not constitute a denial of equal protection. The state has a free hand in dividing its territory into areas for the performance of public functions, and so long as all citizens in an area designated are treated equally, no denial of equal protection occurs, even if in a neighboring area the function is performed differently.

We think, therefore, that within the liberal legislative license allowed a state in prescribing rules of practice relating to its police power, New York has not violated the Equal Protection Clause by denying petitioners a jury trial while granting a six-man jury trial to defendants charged with the identical offense elsewhere within the state.

We find nothing arbitrary, irrational or not reasonably related to a legitimate purpose in the fact that the New York City trial scheme differs from that for identical offenses elsewhere within the state. Plainly, there is a rational reason for a different type of trial in New York City than elsewhere in the state. We conclude, therefore, that there is no classification here involving the invidious discrimination essential to a denial of equal protection.

Accordingly, the petition for a writ of habeas corpus is in all respects denied.

So ordered.

48. Matter of Hogan v. Rosenberg, 24 N.Y. 2d 207, 299 N.Y.S.2d 424, 247 N.E.2d 260 (1969).

49. July 1966 through December 1968. Records are compiled by fiscal year, not calendar year. Since statistics as to traffic cases in Buffalo, unlike New York City, do not distinguish between misdemeanors and violations, all traffic cases have been excluded to enable comparison with the New York City Criminal Court. Source: Office of the State Administrator of the Judicial Conference of the State of New York.

50. 391 U.S. 145 at 160, 88 S.Ct. 1444 at 1453.

51. 373 U.S. 420 at 424, 83 S.Ct. 1366 at 1369.